IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID PETERS,** | : | Case No. 11-cv-850 |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMMUNITY EDUCATION** | : | |
| **CENTERS, INC., et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Baylson, J.                                                                                                       March 13, 2014

### I.   Introduction

Plaintiff David J. Peters brought this action against Defendant Community Education Centers, Inc. ("CEC") and other unnamed defendants (collectively, "Defendants"), for violations of 42 U.S.C. § 1983 (Counts I and II) and for Pennsylvania state law claims of negligence (Count III), intentional infliction of emotional distress (Count IV), and negligent infliction of emotion distress (Count V).  ECF 11.  CEC now moves the Court to grant it partial summary judgment with respect to Counts I, II, IV, and V.  ECF 56.  In his Counter-Statement of Undisputed Material Facts, Peters conceded that he was no longer pursuing Count IV.  ECF 56 ¶ 71.  For the following reasons, CEC's Motion is GRANTED as to Counts I and II.  As a result of this ruling, there are no claims left over which this Court has original jurisdiction.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).  Accordingly, Counts III and V are DISMISSED WITHOUT PREJUDICE.

### II.   Undisputed Facts and Procedural History

CEC is a New Jersey corporation that has contracted with the Delaware County Board of Prison Inspectors to provide daily functional services—including staffing of correctional officers

1

and providing health services for inmates—at George W. Hill Correctional Facility (the "Prison") in Glen Mills, Pennsylvania.  ECF 56-16.

On September 17, 2010, a bench warrant was issued for Peters's arrest for failing to report to the Delaware County Department of Adult Probation and Parole.  Peters's underlying conviction was for driving under the influence, in violation of 75 P.A. Stat. § 3802(a)(1).  Beginning on October 6, 2010, Peters was incarcerated at the Prison.

Peters suffers from *osteogenesis imperfecta*, also known as brittle bone disease.  As the name implies, individuals with this disease are frail and have increased susceptibility to breaking bones.  Upon his arrival, Peters informed CEC officials of his condition.  On October 18, 2010, CEC officials issued Peters a special needs pass that indicated that he was to be assigned to the bottom bunk in his cell—presumably to limit the risk that he might fall or suffer other injury.  ECF 58-8.

Despite having a special needs pass, Peters was housed on a top bunk during his incarceration.  Shortly after his assignment to his cell, Peters informed an unidentified corrections officer that he had a special needs pass for a bottom bunk.  ECF 56-1 at 12.[1]  The officer, however, did not reassign Peters to another bunk—even though other inmates with bottom bunk passes were reassigned at that time.  ECF 56-1 at 12.  Peters also wrote several requests inquiring about his lower bunk status, including two medical requests and letters to Frank Green, the Warden; Michael Gannon, the Chief of Security; David Byrne, the Associate Warden; and John Swidler, Peters's counselor.  ECF 58-25.  Peters received no responses to these inquiries.  ECF 56-1 at 13.

---

[1] Citations to page numbers correspond to the page numbers of the documents as they appear on the docket.

On the night of October 25, 2010, Peters attempted to descend from his top bunk to use the restroom. He fell, fracturing his left forearm and injuring his ankle. ECF 69 ¶ 2.

Peters filed this action in federal court on February 3, 2011, alleging that the inaction of CEC employees violated his Eighth Amendment right to be free from cruel and unusual punishment and that CEC is liable for that violation under 42 U.S.C. § 1983. ECF 1. Peters has also named numerous unidentified correctional officers as "John Doe" defendants in this suit, but these defendants have not been identified or served with process. At oral argument, Peters stated he was proceeding solely against CEC. Peters filed an Amended Complaint on April 13, 2011. ECF 11. On May 3, 2011, CEC filed a Partial Motion to Dismiss Counts I, IV, and V. ECF 13. The Court denied that Motion on October 19, 2011. ECF 20. Now, having completed discovery, CEC moves for summary judgment on all counts except for Count III—Peters's negligence claim. ECF 56. Oral argument was held on February 27, 2014.

## II.     Disputed Facts

Before describing the disputed facts, the Court observes that most of the material facts in this case are not disputed. *See* ECF 71.

Peters claims that CEC maintains a custom of ignoring special needs passes and that this custom violated his civil rights. He asserts he has presented evidence of a systemic breakdown in communication at the Prison between medical staff and corrections staff, which led to his special needs pass being ignored. Alternatively, Peters claims his rights were violated as a result of CEC's failure to train its corrections officers to address the special needs of inmates. He asserts that, whatever nominal special needs policy is in place, CEC employees receive no training on that policy and therefore were ignorant of the serious consequences of ignoring his special needs pass.

CEC disputes that there is any evidence of a custom or practice of correctional officers ignoring the special needs passes of inmates.  Furthermore, CEC contends that it is in compliance with all required standards promulgated by the Pennsylvania Department of Corrections, the American Correctional Association, and the National Commission on Correctional Health Care; that it maintains a specific special needs policy for inmates; and that corrections officers are trained on this policy.

CEC also asserts that, even if CEC employees ignored or violated Peters's rights, this was an isolated incident that is insufficient to put CEC on notice of the existence of a custom or training deficiency that tends to beget constitutional violations, and thus it cannot be liable under *Monell* jurisprudence.

## IV.     Legal Standard

### A.     Summary Judgment

CEC has moved for partial summary judgment as to all counts except Count III. A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating that no genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  In making this determination, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is

4

correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The plaintiff cannot rely merely on the unsupported allegations of the complaint; he must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

### B. Monell Liability

In its Motion, CEC argues that Peters has failed to present evidence demonstrating a genuine issue of material fact for *Monell* liability and that, based on the record, CEC is entitled to judgment as a matter of law.

In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be found liable under § 1983. Municipal liability attaches, however, only where the municipality itself causes a constitutional violation—a municipality is not subject to *respondeat superior* or vicarious liability under § 1983. *Id.* at 694-95. This holding has been extended to private corporations performing municipal functions. *See, e.g.*, *Taylor v. Plousis*, 101 F. Supp. 2d 255, 263 (D.N.J. 2000) (noting that neither "the Supreme

Court nor the Third Circuit has yet determined whether a private corporation performing a municipal function is subject to the holding in *Monell*" but relying on the reasoning of other courts as the basis for applying *Monell*) (citing *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

A municipality or private contractor "may be liable under this section if the [entity] itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."[2] *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Accordingly, to hold a municipality liable under § 1983, a plaintiff must show (1) a deprivation of a federal right, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); (2) a relevant policy or custom attributable to the municipality, *Monell*, 436 U.S. at 691; and (3) "a direct causal link" between the municipal action and the deprivation of the federal right, *Bd. of Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 404 (1997).

A policy is made "when a decisionmaker possessing final authority to establish a municipal policy with respect to the action issues a final proclamation, policy or edict." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (original alteration and citation omitted). A custom is an act "that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." *Id.* (internal quotation marks omitted).

The Third Circuit has identified three situations where acts of an employee will be considered the result of a policy or custom of the municipality for whom the employee works (1) where the appropriate officer or municipality promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2)

---

[2] For the purposes of this opinion, the Court refers to a municipality and a private contractor performing a municipal function interchangeably.

6

where no rules have been announced as policy but federal law has been violated by an act of the policymaker itself; or (3) where the policymaker has failed to act affirmatively at all, though the need to take some action to control the municipality's agents is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need for action. *Id.*

### 1. Legal Standard Establishing Custom

Peters argues that CEC is liable under § 1983 because it maintained a custom of failing to "observe, communicate, and act upon 'special needs passes.'" ECF 71 ¶ 3. He therefore seeks to establish a custom under the third scenario discussed in *Natale*—where the policymaker "sits on his hands after repeated, unlawful acts of subordinate officers . . . ." *Bryan Cnty.*, 520 U.S. at 418 (Souter, J., dissenting).

In this third scenario, a plaintiff must demonstrate that the municipality's inaction was the result of deliberate indifference to its "known or obvious consequences." *Id.* at 407. Deliberate indifference "is a stringent standard of fault . . . ." *Id.* at 410. "A showing of simple or even heightened negligence will not suffice." *Id.* at 407. To satisfy this standard, a plaintiff must adduce evidence that the municipality (1) had notice that similar rights violations had occurred on such a widespread basis that they were likely to occur again and (2) failed to act to address that risk despite the known or obvious consequences of inaction. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Notice is generally established by a pattern of prior constitutional violations. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 975 (3d Cir. 1996) (holding that pattern of written complaints of police officer violence was sufficient for reasonable jury to conclude municipality knew or should have known of violations). Once plaintiff has demonstrated that the

municipality was "aware of similar unlawful conduct in the past," deliberate indifference is established by showing that the municipality "failed to take precautions against future violations." *Beilevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

Additionally, a plaintiff must show that there is a "direct causal link" between the municipality's custom and his constitutional deprivation. *Bryan Cnty.*, 520 U.S. at 404. This burden is satisfied by showing that the custom was the "moving force" that contributed to the injury. *Id*. A plaintiff must show that a particular custom was the "proximate cause" of the constitutional violation. *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996).

### 2. Legal Standard Establishing Failure to Train

As an alternative theory to establish custom, Peters argues that CEC failed to adequately train its employees to properly care for prisoners with special needs passes. In limited circumstances, a municipality's failure to train its employees regarding their legal duty to avoid violating citizens' rights is actionable under § 1983. Under a "failure-to-train" theory, an unconstitutional custom may be inferred where a municipality so failed to train its employees as to display deliberate indifference to the constitutional rights of those within its jurisdiction or in its custody. When policymakers are on actual or constructive notice that a particular omission in their training program causes their employees to violate constitutional rights, the municipality may be deemed deliberately indifferent if it chooses to retain that program. *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (noting that a "'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution"). Under a failure-to-train theory, Peters must prove that (1) CEC failed to adequately train prison officials about tending to the special needs of inmates; (2)

8

CEC was deliberately indifferent to the need for training; and (3) the lack of training had a direct causal link to Peters's alleged Eighth Amendment injury. *Connick*, 131 S.Ct. at 1358.

As with other § 1983 claims based on custom, notice is critical to a failure-to-train theory. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 1360. Accordingly, a pattern of similar constitutional violations is ordinarily required to show deliberate indifference in the failure-to-train context. *Bryan Cty.* 520 U.S. at 409; *see Connick*, 131 S. Ct. at 1360 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." (internal quotation marks and original alterations omitted)).

Where no such pattern is presented, the plaintiff must "demonstrate that the putative constitutional violation was the 'highly predictable consequence' of the defendant municipality's inadequate training program." *Boswell v. Eoon*, Case No. 08-5098, 2013 WL 5863741, at *3 (D.N.J. Oct. 30, 2013) (quoting *Connick*, 131 S. Ct. at 1361). It is only in the rare circumstance where a deficient training program so obviously would lead to constitutional violations that a single incident could demonstrate deliberate indifference. *City of Canton*, 489 U.S. at 390 n.10; *see Bryan Cnty.*, 520 U.S. at 398 (noting that a single incident will indicate deliberate indifference only in a "narrow range of circumstances").

Establishing deliberate indifference toward a training deficiency corresponds with Peters's burden to demonstrate the failure to train was the proximate cause of his constitutional injury. Peters must identify a particular failure in a training program that is "closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391. A generic claim that a program failed to

9

train employees not to be negligent is insufficient to establish a direct causal link to the particular injury suffered by the plaintiff. Liability attaches only if "the deficiency in training actually caused the [constitutional injury]." *Id.* (noting that the plaintiff must show that the "injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect").

V.   **Discussion**

   A.   **Custom of Ignoring Special Needs Passes**

CEC contends that Peters has failed to present evidence showing that CEC maintained a policy or custom that caused Peters to be subject to a constitutional deprivation. With regard to Peters's custom theory, CEC argues that he has not established that CEC's employees ignore special needs passes on such a widespread basis that this practice has the force of law. *Natale*, 318 F.3d at 584. The record indicates that CEC maintains a special needs policy, ECF 56-3, which is in compliance with the National Commission on Correctional Health Care guidelines and American Correctional Association guidelines, ECF 56-2 at 27. CEC has also provided deposition testimony indicating that its corrections officers at least sometimes respond to the needs of prisoners when they are presented with special needs passes. *E.g.*, ECF 56-6 at 11-12.

Of course, Peters's theory is not premised on the absence of an official special needs policy; rather, Peters contends that there is a custom within the prison of ignoring CEC's special needs policy. Peters offers his deposition testimony, which indicates that, shortly after being assigned to his cell, he informed a guard that he was supposed to have a bottom bunk, but the guard did nothing. ECF 58-7 at 12. Peters has also presented evidence indicating that he wrote complaints to Frank Green, the Warden; Michael Gannon, the Chief of Security; David Byrne, Associate Warden; John Swidler, Peters's counselor; and two medical request slips regarding his

special needs pass for bottom bunk status—all of which, according to Peters's sworn affidavit, were ignored.  ECF 58-14; *see also* ECF 58-7 at 12-14; ECF 58-12; ECF 58-13.

Although Peters has provided evidence that one or more individual prison officials may have violated his rights, the record lacks evidence of a widespread custom.  Peters cannot rely on his evidence that several CEC officials ignored his complaints about his October 18, 2010 special needs pass to establish a custom under *Monell*.  *See Connick*, 131 S.Ct. at 1360 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." (internal quotation marks and original alteration omitted)).

In *Connick*, the plaintiff argued that he had satisfied *Monell*'s requirement of demonstrating a pattern of constitutional violations because up to four prosecutors had failed to disclose *Brady* material over the course of his criminal trial.  *Id.*  The Supreme Court treated that course of conduct as a single incident for *Monell* purposes and held that it was insufficient to constitute a pattern of violations.  Similarly, Peters wrote his first complaint about his special needs pass on October 10, 2010.  He incurred his injuries fifteen days later on October 25, 2010.  Although multiple individuals may have been involved in ignoring his complaints, as in *Connick*, the inaction by these individuals only constitutes a single incident for *Monell* purposes.

*Connick*'s holding on this point is relevant here because it reiterates *Monell*'s distinction between liability based on *respondeat superior* and liability based on a custom *attributable* to a municipality.  The law permits this attribution where a practice of constitutional violations is so widespread that a municipality could not plausibly be ignorant of the likelihood of future constitutional violation.  The law treats a municipality's continued inaction in light of this widespread practice as acquiescence and de facto ratification of the custom.  It follows that

whatever objectionable behavior that occurs during a single incident—whether that be the unresponsiveness of several prison officials over the course of fifteen days, as in this case, or the disclosure failures of four prosecutors over the course of a criminal trial, as in *Connick*—that conduct alone is insufficient to put a municipality on notice of the existence of a widespread custom. Without such notice, a municipality cannot be said to have been deliberately indifferent to Peters's rights.[3] *Berg*, 219 F.3d at 276.

Peters's additional evidence of custom does not surmount the requirements of *City of Canton* or *Connick*. Initially, Peters submitted the affidavit of Michael Norley, an inmate incarcerated at the Prison in 2011 and 2012. In his affidavit, Norley attests that he had a special needs pass for a lower bunk and a pass for an extra mattress that were ignored by CEC employees. ECF 58-26. Norley's affidavit, however, is dated August 9, 2013—forty days after the discovery deadline on June 30, 2013. Peters has been afforded more than nineteen months to complete discovery. ECF 51. Consideration of this affidavit would subject CEC to unfair surprise, for CEC had no opportunity to cross-examine Norley in discovery.

Even if the Court considered Norley's affidavit, two instances of inappropriate conduct do not establish a custom under *Monell*. "Isolated events will not establish a pattern of abusive behavior." *Mariani v. City of Pittsburgh*, 624 F. Supp. 506, 511 (W.D. Pa. 1986); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (holding that a supervisor's "knowledge of two incidents of misconduct by correctional officers in a period of one year certainly fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage"); *Cornfield by Lewis v. Consolidated High*

---

[3] Peters contends that CEC employees were deliberately indifferent to his rights because they had actual notice of his condition and did nothing. This, however, is not the relevant inquiry under § 1983 *Monell* liability. CEC must have had notice of the allegedly widespread custom of ignoring special needs passes. Peters may have shown that certain CEC employees were deliberately indifferent to his rights, but, absent evidence of widespread custom, he cannot show that CEC itself was deliberately indifferent to his rights.

12

*Sch. Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir. 1993) (holding that in a failure-to-train action "two reported incidents of strip searching at Carl Sandburg [High School] . . . fall short of a pattern of violations sufficient to put the school board on notice of potential harm to students"); *Davis v. City of New York,* 75 F. App'x 827, 830 (2d Cir. 2003) ("[T]wo incidents of unconstitutional conduct by low-level employees . . . can never provide a reasonable basis for finding a *widespread* or *well-settled* custom.").

Peters's two examples are undercut by his own deposition testimony, in which he acknowledged that, when he informed the corrections officer of his special needs pass and top bunk situation, the officer was in the process of asking other inmates "whether or not they had bottom bunk status and at that time actually moved some." ECF 58-1 at 12. Peters's testimony supports CEC's contention that CEC employees at least sometimes inquire about lower bunk passes and take actions to honor them—though Peters's special needs pass was ignored at the time. *See Brock v. Allegheny Cnty. Dist. Attorney Office*, Case No. 12-0914, 2013 WL 3989452, at *4 (W.D. Pa. Aug. 2, 2013) ("Municipal acquiescence may not be established by isolated incidents of wrongdoing by nonpolicymakers.").

The remainder of Peters's evidence is inapposite. Peters offers two grievance forms filed on April 4 and 5, 2010 that he submitted during a previous term of incarceration at the Prison. In these forms, Peters complained of needing an extra mattress for his back. He asserts that these grievances also went unheeded. These grievance forms, however, do not support Peters's case. The record does not indicate that Peters had a special needs pass for the extra mattress—merely that he earnestly desired one. The fact that Peters submitted requests that went unheeded does not support his claim that CEC maintains a custom of ignoring the special needs passes of inmates.

### B.       Failure to Train Regarding the Special Needs of Inmates

Peters's failure-to-train theory suffers from another evidentiary deficiency.  To be sure, Peters has raised a triable issue regarding a lack of training for the special needs of inmates.  Although CEC has presented evidence showing that it has an official policy regarding special needs, Peters has presented evidence that would allow an inference that CEC employees never received training on this policy.  For example, Michael Gannon, CEC's Chief of Security, stated in his deposition that he had never received training about inmates with special needs.  ECF 58-27 at 7.  Gary Ewen, a correctional officer at the Prison, also stated in his deposition that he never received training regarding special needs passes.  ECF 58-29 at 5.  Peters's burden, however, is much greater than simply identifying an omission or deficiency in CEC's training program.  Peters must show that CEC was deliberately indifferent to the need for special needs training.  *Connick*, 131 S.Ct. at 1358.

For a municipality's failure to train to amount to deliberate indifference, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

The Third Circuit adopted this three-prong test from the Second Circuit's decision in *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992), which was based on the Supreme Court's discussion of deliberate indifference in *City of Canton*, 489 U.S. at 388-90.  Describing the contours of the test, the *Walker* court observed that element (1) creates a knowledge requirement for the municipal policymaker, which underscores the notion that "a policymaker does not exhibit deliberate indifference by failing to train employees for rare or

14

unforeseen events." 974 F.2d at 297. Element (2) requires a plaintiff to show that the situation involves a history of employee mishandling or requires employees to make a "difficult choice." The *Walker* court observed that a "difficult choice" is one that requires more than the application of common sense—and posed the question of whether to use deadly force in apprehending a fleeing suspect to illustrate a difficult decision requiring more than common sense. *Id.* The court also observed that a "difficult choice" might exist where, "although the proper course is clear, the employee has powerful incentives to make the wrong choice." *Id.* Element (3) requires a plaintiff to show that making the "wrong" choice will frequently cause the deprivation of a citizen's constitutional rights, which underscores the notion that policymakers should concentrate training and supervision resources on those situations where employee misconduct is likely to cause constitutional harm. *Id.* at 298. If these three elements are established, then the plaintiff has satisfied his burden to show deliberate indifference.

The fact that CEC maintains a special needs policy is evidence enough that CEC knows its employees will confront a situation in which they will have to address the special needs of inmates. This satisfies element (1). The record also indicates that the special needs of inmates are generally related to legitimate health needs. It goes without saying that ignoring the legitimate health needs of prisoners will frequently cause a deprivation of constitutional rights.[4] Thus, element (3) has also been met. Peters, however, has difficulty satisfying element (2). Under that element, he must identify evidence in the record that suggests that the manner in which CEC officials address the special needs of inmates involves "a difficult choice" or a history of employee mishandling.

---

[4] The Eighth Amendment is violated when acts or omissions of prison officials are (1) sufficiently serious and (2) result in the denial of the minimal civilized measure of life's necessities. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Eighth Amendment's protection against cruel and unusual punishments has been incorporated against the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962).

Peters has not shown that addressing the special needs of inmates involves "a difficult choice." It is conceivable that a correctional officer would be presented with a difficult choice when deciding whether to accommodate a prisoner's special need if the officer had no way of verifying the existence of that special need other than the prisoner's word. The CEC's procedures, however, eliminate this uncertainty by requiring a prisoner to carry their special needs pass on their person at all times. ECF 56-1 at 8-9. Accordingly, CEC employees are not presented with a difficult choice when determining whether to address the special needs of an inmate; if the inmate presents a special needs pass, the employee knows to address the need. This scenario requires nothing more than common sense. Additionally, there is nothing in the record to suggest that prison officials have powerful incentives to ignore a prisoner's special needs pass.

Peters has also failed to show that there is a history of employees mishandling the special needs of inmates. The inadequacy of the record on this point has already been addressed in part V.A and need not be repeated here.[5]

Peters has argued in his briefing and extensively at oral argument that, though a pattern of similar constitutional violations is ordinarily required, it is possible to establish deliberate indifference based on a single incident. Under controlling precedent, this showing is available in

---

[5] Peters points to evidence in the record that suggests corrections officers have no way of knowing the special needs of inmates absent inmates showing the officers their special needs passes. *See* ECF 58-27 (deposition testimony of Chief of Security Michael Gannon indicating that corrections officers cannot access the Prison's computer system to determine if a prisoner had a special need). Though corrections officers may be limited in how they identify the special needs of prisoners, Peters does not indicate how presenting a special needs pass to an officer is inadequate. This line of argument does not support his claim.

Peters also introduced the deposition testimony of Michael Hamre, a sergeant with CEC, in which he recounted an incident where he responded to an inmate having a seizure. Hamre stated that he was unaware of the inmate's health status or if the inmate had a history of seizures. Peters offers this testimony in an attempt to show that CEC employees are ignorant of the special needs of CEC's inmates. This testimony, however, does not support the contention. Neither Hamre's testimony, nor any other evidence in the record, suggests that the seizing inmate had a special needs pass or that the inmate's constitutional rights were violated as a result of Hamre being unfamiliar with the inmate's medical history. This line of testimony would assist Peters if the record established that Hamre's inmate had a special needs pass, corrections officers ignored this pass, and, as a result, the inmate suffered constitutional harm. The record does not show this.

a very narrow range of circumstances.  *See City of Canton*, 489 U.S. at 390 n.10 (suggesting the possibility of a single scenario involving a failure to train that "obviously" reflects deliberate indifference); *Bryan Cnty.*, 520 U.S. at 398 (observing that a single-incident, failure-to-train theory is available only in a "narrow range of circumstances"); *Connick*, 131 S. Ct. at 1361 (observing that a viable single-incident scenario is "rare" and the unconstitutional consequences must be "patently obvious"); *Natale*, 318 F.3d at 584-85 (finding a triable jury issue regarding whether the failure to establish a policy to address the medication needs of inmates during the first 72 hours of their incarceration constitutes deliberate indifference).  To rely on a single incident of unconstitutional conduct for his failure to train claim, Peters must be able to demonstrate that constitutional violations are the "highly predictable consequence" of CEC's inadequate training program.  *Connick*, 131 S. Ct. at 1361.

In *City of Canton*, the Supreme Court provided an example of the kind of obviously inadequate training program that would permit finding deliberate indifference based on a single incident: where a city armed its officers with firearms to assist in arresting fleeing felons but then failed to train its officers on the constitutional limitations on the use of deadly force.  489 U.S. at 390 n.10.  The likelihood of constitutional violations stemming from this failure to train is staggeringly obvious.

By contrast, Peters has failed to show that CEC's failure to train will generate constitutional violations on a "highly predictable basis."  The Court is not persuaded by Peters's argument that the failure to provide CEC's custodial employees with training on CEC's special needs policy is akin to failing to train police officers when to use their weapons when arresting fleeing felons.  CEC's scenario is readily distinguishable because CEC custodial officials are not operating without any guidance whatsoever when dealing with prisoners with special needs.

Unlike the *City of Canton* scenario where officers are issued weapons without instruction, in CEC's case, there is undisputed testimony—including Peters's own—that prisoners are required to keep their special needs pass on their person at all times. *E.g.*, ECF 56-1 at 8-9. These special needs passes plainly indicate what special needs the prisoner has. When presented with a special needs pass, a custodial official is faced with the straightforward command of complying with what the pass requires. This is a far cry from the difficult decision required when deciding to use deadly force while in pursuit of a fleeing felon.

The scenario in *Natale* also does not aid Peters's case. There, the Third Circuit reversed the district court's grant of summary judgment for the Camden County Correctional Facility. The *Natale* court held that a reasonable jury could find that the facility's failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious and likely to cause constitutional violations. Specifically, the court noted that the plaintiff's single incident of being deprived of medically necessary insulin, coupled with the facility's practice—a medical assistant inquires about an incoming inmate's needs, documents those needs, but is not required to pass on that information, nor is there a requirement to see a doctor during the first 72 hours of admission to the prison, nor is there someone charged with determining whether an inmate should see a doctor earlier in the 72-hour period—was sufficient to raise a jury question regarding deliberate indifference at summary judgment. *Natale*, 318 F.3d at 584-85.

Peters's case is distinguishable from *Natale* because of the readily available special needs information displayed on the special needs passes of CEC inmates. In *Natale*, there was no policy in place for assessing and addressing the immediate and serious medication needs of inmates within the first 72 hours of their incarceration. Within that 72-hour period, it is obvious

that the lack of procedures to deal with inmates with medical issues that are immediate and serious would likely lead to constitutional harms.  By contrast, the CEC practice of requiring inmates to carry their special needs passes with them at all times allows custodial officials to have immediate access to information relating to an inmate's special needs, and thus enables them to respond quickly when presented with a special needs pass.  CEC therefore does not have the systemic deficiency at issue in *Natale* because CEC's practice does not create a period of time during which an inmate's special medical needs can go unobserved.

The scenarios that suggest the highly predictable consequence of constitutional harm described in *Natale* and *City of Canton* are far more egregious than the circumstances presented here.  Accordingly, Peters has failed to show that constitutional violations are a highly predictable consequence of CEC's lack of training.

## VI.     Conclusion

There is no dispute in this case about the material fact that Peters was injured.  Nor is there any dispute as to his credibility.

The Supreme Court has set high standards for *Monell* liability that Peters's facts do not satisfy.  Considering Peters's evidence in the light most favorable to him, he has failed to identify evidence in the record suggesting a widespread custom of CEC employees ignoring the special needs passes of inmates.  Peters has also failed to identify evidence that suggests that CEC was deliberately indifferent to the need to train its employees regarding inmates with special needs.  Accordingly, CEC is entitled to summary judgment as to Counts I and II.  Because Peters's remaining claims are state law claims, this Court declines to exercise supplemental jurisdiction over them.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . [if] the district court has dismissed all claims over which it

has original jurisdiction."); *see also Byrd v. Shannon*, 715 F.3d 117, 128 (3d Cir. 2013) (affirming district court's decision to decline supplemental jurisdiction over plaintiff's state claims after granting defendant summary judgment on federal claims); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) (holding that when federal claims are dismissed before trial, federal courts should not separately entertain pendent state claims). Accordingly, CEC's Motion for Partial Summary Judgment is GRANTED as to Counts I and II, and Counts III and V are DISMISSED WITHOUT PREJUDICE.

      An appropriate order follows.

O:\CIVIL 11\11-850 Peters v. Community Educ Ctr\11cv850 SJ Memo.docx